**Case Number 2022CV146**

TeLitha Peterson,

Plaintiff

VS.

The City of Aurora and the Aurora Detention Center

Defendant(s)

**Filed**

OCT 1 7 2022

CLERK OF THE COMBINED COURT
ARAPAHOE COUNTY COLORADO

DATE FILED: October 17, 2022
CASE NUMBER: 2022CV146

## Consent Motion for Leave to file Second Amended Complaint

Pursuant to Rule 15 of the Federal Rules of Procedure and Colo. R. Civ. P. 15, the

Plaintiff respectfully requests that the Court grant Plaintiff's leave to file a Second Amended

Complaint in order to amend the Original Complaint. This amended complaint shall serve as an

revised amended complaint attached. The Plaintiff has conferred with the Defendant in this

matter and all parties have consented to this motion writing.

Under Rule 15(a)(2) of the Federal Rules of procedure a party may amend it's pleading if the

opposing party consents to the amendment in writing., Fed. R. Civ. P. 15(a)(2); Kalish v. Brice

**315 P.2d 829 (1957).**

## Protected Class

Gender Identity as a Female



EXHIBIT K

Case # 2022CV146

## Parties

The City of Aurora and The Aurora Detention Center (More specific: Zelda Deboyse, Deborah Burns and Diane Groetzinger- *Aurora Detention Center Administration* and Gregory Barnett- *Aurora Detention Center Supervisor.*)

## Complaint

**NOW COMES** Plaintiff, TeLitha Peterson ("I", "me" or "my"), and files my complaint of Gender Harassment resulting in Discrimination, Hostile Work Environment and Retaliation against the City of Aurora, Colorado/Aurora Detention Center (the "City" or "ADC"), declares as follows:

## The Facts

### EXHIBIT A

1. STATEMENT OF HARM: I worked as a Detention Officer ("DO") with the City from November 4, 2019 to January 2022. Throughout my employment, I was a loyal and committed civil servant who always strived for excellence – not only for myself but for the City, as well. For example, shortly after beginning my employment at ADC, I began raising concerns about ADC's Standard Operating Procedures ("SOPs") which govern the conduct of and protocols for DOs and other staff members. Specifically, I was concerned that the SOPs were outdated, inapplicable to ADC's day-to-day operations, did not reflect best practices,

**EXHIBIT** Page 2

Case # 2022CV 146

included procedures that had since been prohibited and could result in legal liability, and lacked any procedures or rules relating to use of force. I shared my concerns with several staff members, supervisors and administrators, including Jason Welt, my then immediate supervisor, Deborah Burns, ADC Supervisor, Diana Groetzinger, Detention Administrator. I even emailed Zelda DeBoyes, Court Administrator, for permission to write SOP Proposals and suggested ADC form a Policy Committee to review and implement changes to the SOPs. I subsequently forwarded that email to Ms. Burns and Mr.Welt. Instead of rewarding my initiative, Mr. Welt told me that ADC administration and Ms. Burns were not happy with me "going above their heads". I was criticized for my efforts repeatedly, including being told by Ms. Burns "it did not shed me in a good light to keep going above their heads". I explained the importance of timelines in the proposal and the lack of response from Ms. Groetzinger which was why I continued to push for changes to the SOPs. Of course, my actions were motivated solely by my real legitimate concerns regarding the out-of-date SOPs and potential liabilities and threats they posed. In the face of increasing hostility, I requested that my proposals be taken off the table because I felt like I had a target on my back. However, Ms. Burns refused. Interestingly, ADC had since adopted my suggestion to form a Policy Committee, but refused to let me sit on that Committee or be involved in updating the SOPs.

2. On or around July 18, 2020, I spoke with Richard Andersen, who was also a supervisor, who relayed that Ms. Groetzinger had told Ms. Anderson that I was "lazy" and alleged that I was dating a co-worker, Mario Clark. Ms. Groetzinger also told Mr. Anderson that they were actively looking for a way to write up Officer Clark and myself for dating. This was not only wholly inappropriate, but it was also blatantly untrue. Officer Clark and I were friends, but we were not

**EXHIBIT** Page 3

Case # 2022CV 146

in a romantic relationship. Moreover, even if it were true, Officer Clark and I would not have

been in violation of any ADC rules because neither of us were supervisors.


3. On July 25, 2020, Ms. Groetzinger pulled Officer Clark and Me from the floor and directed us

to file paperwork in the nurse's office. Ms. Groetzinger claimed she was doing this because she

"felt like we weren't doing anything". However, at the time that Ms. Groetzinger assigned

Officer Clark and I to file paperwork, there was an ongoing protest related to Elijah McClain. All

DOs were instructed to stay on the floor by Lead James Hensen so he knew where officers were

located at all times, for our safety. We relayed this information to Ms. Groetzinger, but she chose

to micromanage with no justification and directed us to go file paperwork anyways. Later, as the

crowd outside the facility became violent, breaching the Aurora Municipal Court and setting fire

to offices, our supervisor was frantic about finding us. We were reprimanded in Briefing the next

day and told we should have stayed on the floor. We explained that we were given a directive by

Ms. Groetzinger to go file and despite our efforts in telling her that we were told to remain on the

floor, we were made to do it anyways. We were told that we should have never been told to exit

the floor during such a serious situation per protocol.


4. In or around the beginning of October of 2020, Greg Barnett and Lamar Key were promoted

to supervisor positions.


5. Shortly after Mr. Barnett became my supervisor, he ramped up his campaign of hostility,

discrimination, and retaliation. For example, in mid-October of 2020, Mr. Barnett belittled and

degraded me on the floor in front of my peers and detainees, after I had approached Mr. Barnett

**EXHIBIT** Page 4

Case # 2022CV146

to ask his advice about whether it was okay for an officer to speak with a detainee, even though the detainee's victim was physically present with the officer. I knew that officers were prohibited from acting as an intermediary or third-party communicator between a detainee and victim, but the issue involved who was going to care for the detainee's and victim's children who had been left alone. However, when I asked for his opinion, he snapped at me, asking me "What about this situation can you not handle on your own?" When I then tried to explain that the situation was complicated and that I wanted to ere on the side of caution, Mr. Barnett said that I was employed "to make decisions on my own". Mr. Barnett subsequently pulled me into an interrogation room, blocked the door with his body, and yelled at me, saying he "didn't understand why I couldn't make that decision on my own" and that I should "reevaluate" being a DO. During his belittling of me, Mr. Barnett also mentioned my sick leave as one of the reasons he was upset with me. This conversation was so loud that my peers heard it outside of the room. I asked him not to speak with me in such a tone and he refused and continued. It ended in me crying; one of my peers, Gabriel Novaes was waiting outside of the door. She seen me crying and stated we should go outside so other peers and detainees did not see me crying on the floor.

6. Mr. Barnett also began micromanaging me and constantly criticizing me for small things for which male and white employees were not criticized causing me significant emotional distress. The demeaning behavior of questioning my competency for the job became continuous as well. For example, in mid-October, Mr. Barnett harassed me about where I signed my name and where I wrote the name of the DO who relieved me from my shift on routine paperwork. According to Mr. Barnett, I put the information in the wrong place, it should be noted there was not an assigned spot before. However, there was less than a 3-inch difference in where I had

EXHIBIT 1 Page 5

Case # 2022CV146

written the DO's name compared to where Mr. Barnett wanted me to write it and he made me scratch out my signature on the document and replace it just below the original spot. I complied with his request without argument and then asked him if there was anything else that he would like for me to fix. Mr. Barnett retorted that he was "sure [he would] find something else" to correct. Mr. Barnett also began monitoring the cameras to see the specific times I arrived to work and how long I took for lunch breaks. Mr. Barnett explicitly told me that he was checking the cameras to verify when I arrived to and left ADC. Mr. Barnett did not micromanage or nitpick other similarly situated employees in this way. My coworkers started recognizing the change in my behavior and asking if I was ok. I expressed to several officers that I was becoming depressed under the pressure and watchful eye I was being subjected to by Mr. Barnett.

7. In response to the constant criticisms, I approached Mr. Barnett and asked if it was possible for him to give me and the other DOs positive feedback instead of always pointing out the negative issues, as this was having a detrimental effect on moral. Mr. Barnett snapped back, stating that he would point out positive things if we ever did positive things.

8. By the end of October in 2020, I started experiencing health problems, including tightness and pain in my chest, as a result of the overwhelming hostility and unfair treatment to which I was being subjected by Mr. Barnett. The stress placed on me was so great that I ended up in the emergency room (the "ER") on October 31, 2020 because of the tightness in my chest. At that time, my treating physician, in the ER informed me that the constant stress I was experiencing was causing strain on my heart. It should be noted that I had no documented heart issues before these incidents started happening.

**EXHIBIT** Page 6

Case # 2022CV146

Around this time, I also began experiencing frequent panic attacks as a result of the overwhelming stress caused by Mr. Barnett being my supervisor. Indeed, I had to use several hours of my sick and personal time to go home when I had these panic attacks because of embarrassment. In an effort to feel more comfortable going to work, I sought out counseling with the Employee Assistance Program to gain coping skills that would enable me to endure Mr. Barnett's constant harassment and hostility without having panic attacks. I would go to the restroom and start the coping skill routine, later I would limit my bathroom routine because Barnett stated I needed to be on the floor. I would have gone to the Administration at this point, but previous female staff went to the Administration and complained of Mr. Barnett's berating and demeaning behavior and nothing was done. By this time he had called another female coworker "stupid" told her he was actively trying to get her fired, continuously criticized another female coworker's uniform and told another coworker she needed to stop eating because she was gaining weight.

The atmosphere felt hopeless to go to the Administration at the time with any complaints, but I did complain to other supervisors about the hostile environment being created by Mr. Barnett's behavior. I was told that employees and supervisors alike informed the Administration of the growing complaints about Mr. Barnett's behavior, but the Administration wasn't going to address them, because Mr. Barnett was handpicked by Zelda Deboyse to be in the Supervisor's position and her authority was not to be questioned.

**EXHIBIT K** Page 7

case # 2022CV146

9. In the beginning of November of 2020, a disgruntled detainee threatened to assault a nurse. I promptly reported the incident to Mr. Barnett and relayed that the detainee was in no condition to see the nurse until and unless she calmed down. Letting detainees calm before taking them to the next step was common protocol to limit safety concerns that may arise. Mr. Barnett responded that "[he] was the one who made the decisions" and that I needed to take the detainee despite the obvious risk to the nurse and potentially other staff members, as well. The detainee attempted twice to strike the nurse and had to be escorted out of the nurse's station without completing her assessment, to prevent the nurse from being assaulted.

10. On November 5, 2020, Mr. Barnett held a debriefing to discuss an incident that occurred the night before during which a nurse had requested an Aurora Police Department Officer put a face mask on because she didn't feel comfortable. Mr. Barnett stated that the nurse didn't have the authority to tell an officer what to do because he makes the decisions regarding officers and his unit. I, wanting clarification, asked Mr. Barnett to explain because it didn't make sense that a nurse, who had a degree in healthcare and probably knew more about COVID-19 than Mr. Barnett or the officers did, wasn't allowed to instruct officers to put face masks on. Mr. Barnett retorted that whether officers wear masks isn't the nurse's "business" and that she doesn't "get to tell an officer to do anything". A female officer next to me then spoke up and repeated that Mr. Barnett's stance didn't make sense. Seeing that Mr. Barnett was beginning to get visibly agitated, I turned to the officer and told her to drop it and that we could ask Ms. Burns

later for clarification. Mr. Barnett became angry and told me to go to the hall. Because I had previously been trapped and yelled at by Mr. Barnett, I did not feel comfortable going anywhere with him alone and stated I would not leave. Mr. Barnett then raised his voice and told me that

Case # 2022CV146

I "need[ed] to leave". At that point, an officer spoke up and asked that we all be dismissed because of how uncomfortable the situation was. I started leaving with my co-workers, but as I passed Mr. Barnett, he reprimanded me again and said I needed to learn to listen better. At that point, I was understandably frustrated, asserted that he should not talk to me like that and that I had already asked him to not speak with me in such a condescending and belittling tone. After I returned to the floor, I started crying in front of my coworkers. Ms. Groetzinger and Ms. Burns called me into a meeting and told me to go home and that I could return on November 6, 2020.

11. Before going home, I went to speak with Ryan Lantz, Deputy Director of HR. I was still visibly upset as I relayed the event to Mr. Lantz and the behavior he was displaying prior to that date. Mr. Lantz responded that Mr. Barnett's behavior was absolutely not okay, and that Mr. Barnett was out of line. I also shared my part in the interaction, and Mr. Lantz responded affirmatively, saying that the role I took on was a natural response to the hostile work environment to which I was being subjected. Mr. Lantz also stated that he felt like my response was justified based on the circumstances and encouraged me to "not beat myself up". Mr. Lantz stated that if I wanted to file a complaint with the Employee Relations Department about my claims to let him know and he would put me in touch with them. I was apprehensive about filing a complaint at that time because I was concerned about retaliation from the Administration for doing so. I expressed the concern with Mr. Lantz and explained that despite several complaints to the Administration, nothing was being handled my by them. Mr. Lantz encouraged me to file a complaint with the Employee Relations Team and the matter would be investigated.

EXHIBIT Page 9

Case # 2022CV146

12. On November 7, 2020, Ms. DeBoyes called me into the Administration Conference Room

and placed me on paid leave pending an investigation into the events on November 5th.

Ms. DeBoyes did not give me a chance to share my side of the story. Instead,

Ms. DeBoyes summarily stated that she had watched the video of Greg Barnett's and

my interaction and felt like I was completely out of line. I attempted to explain that my reaction

was the result of ADC administration's failure to address or correct Mr. Barnett's behavior

despite receiving multiple complaints that he was hostile and belittling to DOs. However,

Ms. DeBoyes had already made up her mind. I was told on that date that an investigation would

be completed during my leave and was dismissed to go home. It should be noted that Mr. Barnett

was never placed on leave due to his role concerning the incident and continued to be a

supervisor.


13. Because of the continued and increasing hostility and discrimination, I informed Mr. Lantz

that I wanted to file a formal complaint against Mr. Barnett and Ms. Groetzinger. Mr. Lantz told

me that he would share my information with Patricia Sylvester, Employee Relations Officer,

who would contact me about writing a formal statement.


14. On November 11, 2020, Ms. Groetzinger called me at home and informed me that I may

have been exposed to COVID-19 and needed to get a test.


15. On November 13, 2020, Ms. Groetzinger called me and told that I could return to work on

November 16, 2020 since my test had been negative, but that I would be on Day Shift and not on



EXHIBIT K

Page 10

Case # 2022CV146

Swing Shift, which I had bid for, with no explanation. Of course, this sudden and
unjustified change resulted in Mr. Barnett again supervising me on Day Shift.

16. On November 23, 2020, I submitted my full, written complaint against Mr. Barnett and
Ms. Groetzinger to Ms. Sylvester via email alleging race and gender discrimination and
retaliation.

17. Only two days later, on November 25, 2020, Mr. Barnett sent me home, allegedly that Ms.
Burns had instructed him to do so. Shortly after arriving at home, I received a call from
Ms. Groetzinger and was told that I needed to return to work immediately if I wanted a full
paycheck. I inquired as to why my schedule had been changed to the Day Shift and why I was
not able to return to my original shift I bid on which was Swing Shift.
Ms. Groetzinger responded that I was going to have to remain on Day Shift until the
investigation was complete. I protested because Mr. Barnett was going to be my direct supervisor
again if I was forced to work the Day Shift. Despite being aware that there was an ongoing
investigation into Mr. Barnett's treatment of me, Ms. Groetzinger, callously responded "Yes, and
he will be your supervisor until the next shift bid." A few weeks later, I was able to bid on the
Graveyard Shift. However, after I did so, Mr. Barnett was also switched to the Graveyard Shift
and continued to directly supervise me despite the open investigation with the Employee
Relations Team.

18. On December 3, 2020, Ms. Groetzinger and Ms. Burns presented me with a Disciplinary
Action and told me that I was being placed on five days of unpaid suspension as punishment. In

EXHIBIT 11

case # 2022cv146

addition to the incident with Mr. Barnett on November 5th, the Disciplinary Action was also

based on an interaction I allegedly had with another DO, Brenda Wallace, over six months prior.

Ms. Wallace apparently accused me of getting heated during a discussion and

slamming my hands on a desk. Of course, this was entirely untrue, and no one had counseled or

even approached me during the six months between when it supposedly took place and when

I received the Disciplinary Action. As a result, Ms. Groetzinger was able to justify a more severe

punishment for me because there was an alleged pattern of hostility. I, disagreeing with the write

up, refused to sign it and submitted an appeal on December 10, 2020.


19. On December 9, 2020, Mr. Barnett gave me my performance evaluation in which he rated

me as below average and alleged that I didn't meet expectations, was hostile, and needed to

"watch [her] tone and body language". This rating was not justified as I was rated as an excellent

performer prior, nothing negative, to my knowledge was placed in my file and I had never been

addressed for such behavior. I felt the rating of that Performance Evaluation was clearly in

retaliation for my complaint against Mr. Barnett. I immediately emailed Ms. DeBoyes to appeal

the performance rating.


20. On December 11, 2020, I met with Ms. DeBoyes regarding my performance rating appeal. I

explained in that meeting that nothing had ever been documented, to my knowledge, about the

alleged behavior in the Evaluation. I also stated that I have not had any disciplinary action,

verbal or written, of any kind throughout my employment with The Aurora Detention Center

prior to the incident with Mr. Barnett. As a result of that meeting, my rating was changed from

"below average" to "average". Despite this change, Ms. DeBoyes informed me that the language

**EXHIBIT** Page 12

CaSe # 2022CV146

in my evaluation, namely that I needed to "monitor [her] tone and body language" and that I was "aggressive towards staff", would remain in the evaluation. Of course, Ms. DeBoyes' refusal to remove these portions of my review meant that every hiring supervisor within the City would be able to view the inflammatory and inaccurate language, which significantly hindered my ability to move departments or be promoted.

21. On December 17, 2020, I met with Ms. DeBoyes regarding my Disciplinary Action appeal and was informed by Ms. DeBoyes that my punishment was going to be decreased from five days unpaid leave to two days and that her decision was final and not up for debate. I wanted to appeal this process, but after further investigation into the lengthy process, I felt hopeless to try.

22. On January 7, 2021, I emailed Ms. Sylvester for an update on the external investigation into my complaint. Ms. Sylvester responded that she believed the investigation concluded and a report was being generated. The next day, on January 8, 2021, Karin Ranta-Curran, the investigator assigned to look into my complaint, changed course and informed me that the investigation was not concluded and that she had follow up questions for me and wanted to schedule another meeting.

23. Between January 9, 2021 and January 18, 2021, I was unable to work because I was experiencing COVID-19 symptoms. During that time, I tested negative but was told by my physician that I needed to remain home because I could still have COVID-19. HR subsequently informed me that I would be required to use my accrued vacation time and that

EXHIBIT Page 13

Case # 2022CV146

they would not be paying me normal pay because my test was negative. I later found this information was inaccurate and the illness would be coded to not take my time.

24. On January 22, 2021, Mr. Barnett informed me that all of my vacation time would be used for COVID-19 leave, leaving me with only two remaining hours of accrued time. I initially told Mr. Barnett that I was going to appeal but retracted my statement upon finding out that my time had simply been entered incorrectly by Mr. Barnett. Despite telling Mr. Barnett that I would not be appealing after all, Mr. Barnett emailed Ms. Groetzinger stating that I wished to appeal, even though the issue was resolved.

25. In late February or early March of 2021, I called Mr. Barnett to report that I wasn't feeling well and requested that I be allowed to work in the Control Center where I wouldn't expose anyone if I was sick. This would allow the ADC to remain fully staffed and would minimize any health risks. Importantly, this accommodation was consistently approved for DOs when they did not feel well. I was also told by Ms. Burns to do this practice instead of calling off completely to keep the facility from being short of employees for the shift. However, Mr. Barnett rejected the idea immediately, even though this was a common practice, and I was not aware of any DOs who have been denied the accommodation. As a result of Mr. Barnett's unwarranted refusal to allow me to work, I was forced to use my paid leave.

26. On April 11, 2021, I became aware, for the first time, which I had been denied for a supervisor position that I applied for on June 10, 2020 without any consideration. I met all the qualifications for this position, and I passed the initial phase of the hiring process. However,

EXHIBIT K{

custom

custom

Case # 2022 CV 146

contrary to normal practice, I never received a letter informing me that I was not selected for the position. Then, on April 11, 2021, I visited the job application portal for the City as I had never heard anything regarding that position. At that time, I became aware that Ms. Groetzinger denied my application not even a minute after I had been approved by HR to move forward to the second phase. Notably, this was not the only time that I was unfairly passed over for a position in retaliation for my protected activity. In fact, in December of 2020, I applied for an Employee Relations position. I advanced through the first round but was informed on January 31, 2021 that the City had filled the position. However, when I was checking on the status of my applications on April 11, 2021, I noticed that the position had been re-posted. I applied again, but was informed that I allegedly did not meet the minimum qualifications. This is clearly pre-textual as I had met the minimum qualifications and advanced past the first round only a few months prior.

27.     On April 13, 2021, I finally received the results from the City's investigation into my complaint. Although witnesses told me that they corroborated my complaint, the City determined that there wasn't evidence of discrimination. I received a copy of all written statements made by my coworkers with the Employee Relations Investigation, and I currently have them in my possession, as it was my right to obtain a summary of the investigation. Even though the documents were heavily redacted by the city, several statements corroborated my claims and complaint. The documents will show my coworkers noticed how my mood changed from being enthusiastic to be at Aurora Detention Center to defeat due to the discrimination, hostile work environment and retaliation the job subjected me to.


Page 15
EXHIBIT K

Case # 2022cv 146

28.    On or around January 1, 2022, I entered my two week notice with the Aurora Detention Center. On that two week notice. I was so concerned that retaliation would follow to me getting other jobs that I wrote that I was happy to have had the opportunity to work for Aurora Detention Center.

29.    JURISDICTIONAL STATEMENT: The Arapahoe District Court has jurisdiction over the subject matter of this charge and the named Respondent, pursuant to the provisions of the *Colorado Revised Statutes Colo. Rev. Stat. § 15-5-203*.

Amended Complaint **Respectfully Submitted** October 17, 2022.



Date 10/17/2022

EXHIBIT K